## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| In re ADDICKS AND BARKER (TEXAS) FLOOD-CONTROL RESERVOIRS | **Master Docket No. 17-3000L** |
| **THIS DOCUMENT APPLIES TO:** **Micu, et al., v. USA, 17-1277L** | |

### FIRST AMENDED CLASS ACTION COMPLAINT FOR UPSTREAM PLAINTIFFS

Plaintiffs Christina Micu, Sandra Rodriguez, Erich Schroeder, Catherine Popovici, Elisio Soares, Marina Ageyeva, Glenn Peters, Virginia Holcomb, and Scott Holland (collectively, "Plaintiffs"), appearing individually and on behalf of all persons similarly situated, respectfully submit this First Amended Class Action Complaint for Upstream Plaintiffs against the United States of America ("United States" or "Government") and allege:

### INTRODUCTION

1.      This lawsuit for just compensation centers on the flooding of private property within the Addicks and Barker Reservoirs caused by the Government during Tropical Storm Harvey. Between August 25 and 29, 2017, Tropical Storm Harvey drenched the Houston area with near-constant rainfall. Much of Harris County and Fort Bend County received more than 30 inches of rain over this five-day period. Over 131,000 homes and businesses flooded in Harris County alone. In the case of over 10,000 flooded private properties that were built within the "Maximum Design Pool" of Addicks Reservoir and Barker Reservoir, two large federal flood control projects in west Houston, this was just as the Government intended.

2.      The Government designed the Addicks and Barker Dams and Reservoirs to accommodate a specific Maximum Design Pool. The Maximum Design Pool of each reservoir

encompasses the area of land located behind and upstream of each dam that the Government designed to be inundated during the maximum design storm. The Maximum Design Pool elevation is the elevation at which the reservoirs are considered to be at full storage capacity. For Addicks, the Maximum Design Pool elevation is 115 feet (NAVD 1988, 2001 adj.). For Barker, it is 108 feet.

3.      Despite intending for a large area of land within the Maximum Design Pool for each reservoir to be inundated, the Government owns only a portion of that land. The remaining land within the Maximum Design Pool is private property. Plaintiffs and members of the putative class they represent ("Putative Class") own or lease this private property.

4.      During and after Harvey, the Government impounded and intentionally stored more than 380,000 acre-feet of Tropical Storm Harvey's storm waters inside the two reservoirs. The Government stored this water for over 10 days on private property located within the two reservoirs. As a result and consistent with the reservoirs' design, the Government flooded Plaintiffs' and the Putative Class' real and personal property. At no point did the Government compensate Plaintiffs, the Putative Class, or their predecessors-in-interest for any right to flood their private property.

5.      These actions constitute a taking under the Fifth Amendment of the U.S. Constitution. Plaintiffs, individually and on behalf of the Putative Class, seek just compensation for the taking of their property by the Government.

## STATEMENT OF JURISDICTION

6.      Plaintiffs, on behalf of themselves and the Putative Class members, seek just compensation from the Government in excess of $10,000. Jurisdiction and venue therefore are proper under 28 U.S.C. § 1491.

## PARTIES

7.      Plaintiff Christina Micu owns real property at 6411 Canyon Park Drive, Katy, Texas 77450. The property description is Canyon Gate Cinco Ranch Section 7, Block 2, Lot 1, in Fort Bend County, Texas. She and her spouse have owned this property since 2012 and owned it at the time of the flood. Their real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Barker Reservoir in August/September 2017.

8.      Plaintiff Sandra Rodriguez owns real property at 6215 Pebble Canyon Court, Katy, Texas 77450. The property description is Canyon Gate Cinco Ranch Section 1, Block 1, Lot 58, in Fort Bend County, Texas. She and her spouse have owned this property since 2013 and owned it at the time of the flood. Their real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Barker Reservoir in August/September 2017.

9.      Plaintiff Erich Schroeder owns real property at 19914 Sky Hollow Lane, Katy, Texas 77450. The property description is Lot 30, Block 4, Kelliwood Section 5, in Harris County, Texas. He and his spouse have owned this property since February 2015 and owned it at the time of the flood. Their real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Barker Reservoir in August/September 2017.

10.      Plaintiff Catherine Popovici owns real property at 19927 Parsons Green Court, Katy, Texas 77450. The property description is Lot 21 and Tract 22A, Block 4, Kelliwood Section 5, in Harris County, Texas. She and her spouse have owned this property since 2003 and owned it at the time of the flood. Their real and personal property was inundated, destroyed,

3

substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Barker Reservoir in August/September 2017.

11.     Plaintiff Elisio Soares owns real property at 20526 Indian Grove Lane, Katy, Texas 77450. The property description is Lot 7, Block 1, Cinco Ranch Equestrian Village Section 3, in Harris County, Texas. He has owned this property since 2001 and owned it at the time of the flood. His real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Barker Reservoir in August/September 2017.

12.     Plaintiff Marina Ageyeva owns real property at 12619 Wilbury Park, Houston, Texas 77041. The property description is Lot 1, Block 3, Lakes on Eldridge, Section 2 Amend. Ms. Ageyeva has owned this property since 2012 and owned it at the time of the flood. Her real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Addicks Reservoir in August/September 2017.

13.     Plaintiff Glenn Peters owns real property at 13639 Harpers Bridge Drive, Houston, Texas 77041. The property description is Lot 41, Block 4, Concord Bridge, Section 4. He and his spouse have owned this property since 1989 and owned it at the time of the flood. Their real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Addicks Reservoir in August/September 2017.

14.     Plaintiff Virginia Holcomb owns real property at 16510 Loch Maree Lane, Houston, Texas 77084. The property description is Lot 18, Block 8, Glencairn Park. Ms. Holcomb has owned this property since November 2009 and owned it at the time of the flood.

Her real and personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Addicks Reservoir in August/September 2017.

15.     Plaintiff Scott Holland leased property at 1923 Wingleaf Drive, Houston, Texas 77084. The property description is Lot 48, Block 3, Mayde Creek Farms, Section 1. Mr. Holland and his spouse leased the property for approximately 20 years, and leased it at the time of the flood. Their personal property was inundated, destroyed, substantially damaged, and/or devalued as a direct result of the Government's intentional storage of water in Addicks Reservoir in August/September 2017.

16.     In addition to asserting individual claims, Plaintiffs assert claims on behalf of the Putative Class and its members, as described below under "Class Allegations."

17.     Defendant is the United States of America, a sovereign entity and *body politic*. Defendant answers for one or more of its agencies, especially the U.S. Army Corps of Engineers ("Corps of Engineers" or "Corps"), and specifically with respect to the Addicks and Barker Dams/Reservoirs. Counsel for the United States has appeared in this case.

## FACTS

18.     This case seeks just compensation under the Fifth Amendment for thousands of property owners and property lessees whose real and/or personal property were taken as a result of the Government's use of two federal flood control projects known as Addicks and Barker Dams/Reservoirs.

19.     As further described below, thousands of homes, businesses, and other improvements were constructed on non-federal, private property within the two reservoirs. During Tropical Storm Harvey, just as the Government internally predicted for years,

stormwaters accumulated inside the Government's reservoirs, were stored behind their dams, and inundated this private property.

**Following Congressional Authorization of a Flood Control Plan for Houston, the Government Built Addicks and Barker Dams/Reservoirs in the 1940s**

20.     Heavy rains in 1929 produced floodwaters that rushed down Buffalo Bayou and its tributaries into the City of Houston, devastating the downtown area. In 1935, even heavier rains fell and produced even greater flooding in the city and port of Houston.

21.     In response to these major floods, the Government, acting through the Corps of Engineers, authorized the design and construction of Addicks and Barker Dams/Reservoirs for the purposes of flood control as part of the Buffalo Bayou and Tributaries Project ("BBTP") under the Rivers and Harbors Act, approved on June 30, 1938. The BBTP was modified by the Flood Control Acts of August 11, 1939, and September 3, 1954.

22.     The BBTP was intended to provide for flood control improvements to Buffalo Bayou and its principal tributaries, White Oak Bayou and Brays Bayou. The purpose of the BBTP was to provide flood protection to properties, including residences and businesses extending to downtown Houston, that are located in the downstream floodplains of Buffalo Bayou and its principal tributaries.

23.     As originally contemplated, this flood control project was to include a single large dam/reservoir across Buffalo Bayou. However, due to the high cost associated with a single dam/reservoir bisected by Interstate Highway 10, two smaller dams/reservoirs were proposed instead—Addicks to the north of I-10 and Barker to the south of I-10.

24.     The flood control plan authorized by the Government through the BBTP eventually contemplated three detention reservoirs: Addicks, Barker, and a third, called White Oak Reservoir. A canal system was to convey releases from White Oak Reservoir to the north of

Houston into the San Jacinto River, while another canal system would convey releases from Addicks and Barker Dams/Reservoirs to the south of Houston into Galveston Bay. Further, a levee was to be constructed along the Cypress Creek watershed divide to prevent overflow from the Cypress Creek watershed into the Addicks watershed.

25.     The proposed White Oak Reservoir, the Cypress Creek levee, and the two north and south canals were not built. Instead, only the Addicks and Barker Dams/Reservoirs were built, along with some limited channel improvements immediately downstream of these two dams.

26.     Addicks and Barker Dams/Reservoirs are strategically located 17 miles west of downtown Houston above the confluence of Buffalo Bayou and South Mayde Creek. Below this confluence, Buffalo Bayou continues east to downtown Houston. There it joins with White Oak Bayou, continues further east to eventually include the Houston Ship Channel, and flows into San Jacinto Bay. The Government built these two dams/reservoirs to prevent catastrophic flooding and damage to downstream properties along Buffalo Bayou during and after large storm events.

27.     Barker Dam/Reservoir was built in both Harris County and Fort Bend County, on the south side of present-day Interstate Highway 10, west of Texas State Highway 6. The construction of Barker Dam began in February 1942 and was completed in February 1945.

28.     As constructed, Barker Dam consists of an earthen embankment that measures 71,900 feet long. The Barker Dam runs along the south, east, and north sides of the reservoir. There is no levee, dam or embankment on the west side of Barker Dam/Reservoir because the ground elevation is higher on that side, which is where stormwaters from upstream portions of the watershed enter the reservoir area and are impounded and stored behind the dam.

Additionally, five outlets at the bottom of the dam were constructed to allow for the slow release of these stored waters into the downstream Buffalo Bayou. These outlets were originally designed to be uncontrolled, but have now been provided with gates to control the release of stored waters.

29.     Addicks Dam/Reservoir was built entirely within Harris County on the north side of present-day Interstate Highway 10. Texas State Highway 6 bisects the reservoir north to south.

30.     The construction of Addicks Dam began in May 1946 and was completed in December 1948. As constructed, Addicks Dam consists of an earthen embankment that measures 61,166 feet long. The Addicks Dam runs along the south and east sides of the reservoir. There is no levee, dam, or embankment on the west or north sides of Addicks Reservoir because the ground elevation is higher on those sides, which is where stormwaters from upstream portions of the watershed enter the reservoir area and are captured and stored behind the dam. Additionally, five outlets at the bottom of the dam were constructed to allow for the slow release of these stored waters downstream into Buffalo Bayou. These outlets were originally designed to be uncontrolled, but have since been provided with gates to control the release of stored waters.

31.     According to Corps documents, the Government designed the two dams/reservoirs in the 1940s to capture and store floodwaters associated with the "Design Storm." The Design Storm was calculated based on the probable maximum rain that could be expected to occur in the area. For Addicks and Barker Dams/Reservoirs, the 1899 storm that dumped over 30 inches of rain in 72 hours over Hearne, Texas was selected as the probable

maximum rain for calculating the Design Storm volumes. For each Design Storm, the Government assumed that 90% of the rain would become runoff and enter each reservoir area.

32.     Together, the non-damaging releases from both Addicks and Barker Dams/Reservoirs into Buffalo Bayou were originally calculated to be about 15,000 cubic feet per second from these two reservoirs. The Government used the Design Storm runoff to determine how much water would need to be stored behind the dams and within the reservoirs while non-damaging releases of about 15,000 cubic feet per second occur. The Government also used this Design Storm information to determine how high the dams needed to be built to be safe and not fail during such a storm.

33.     The Government calculated the resulting Design Storm pool level for each reservoir. For Addicks, the Government calculated this number to be 108.3 feet above mean sea level (NGVD 1929); for Barker, 101.7 feet above mean sea level. The top of the two dams were set several feet higher than the design pool levels to ensure their safety and prevent them from being overtopped.

34.     The Corps began acquiring land for the Addicks and Barker Dams/Reservoirs in the early 1940s. Acquisition of land was complete by 1948 for Addicks Dam/Reservoir and 1951 for Barker Dam/Reservoir.

**In the 1980s, the Corps Redesigned Addicks and Barker Dams/Reservoirs, and the Changes Established a New Maximum Design Pool for the Reservoirs**

35.     In the 1980s, with the advantage of more recent data and technology, the Corps undertook a reevaluation of Addicks and Barker Dams/Reservoirs. This reevaluation resulted in the Maximum Design Pool elevations, which are relevant to this lawsuit. The Corps had developed new dam safety design criteria that included updated design rainfall information for the area. The Corps then reevaluated how Addicks and Barker Dams/Reservoirs would function

under the new criteria and ultimately decided that the Addicks and Barker Dams/Reservoirs needed to be redesigned and reconstructed to satisfy the new criteria.

36.     As part of the redesign and reconstruction, the top of both Addicks and Barker Dams were raised several feet. Additionally, at both ends of each of the two dams, the Corps added emergency spillways that were concrete-lined to provide erosion protection as floodwaters flow over them.

37.     According to a 2013 Corps document, the height of the Addicks Dam varies from 117.4 feet to 121 feet (NAVD 1988, 2001 adj.) along the length of the main dam embankment. This is approximately 48 feet above the streambed up to the highest point. In addition, the Addicks Dam has a spillway on either end of the dam that is armored with a concrete apron. The spillway's crest elevation at the northern end of the dam is reported to be 112.5 feet, and, at the southern end of the dam, the other spillway's crest elevation is reported as 115.5 feet. The elevation of the natural ground at the end of each spillway is reported as 108 feet at the northern end and 111 feet at the southern end.

38.     According to 2013 Corps document, the height of the Barker Dam varies from 110 feet to 113.1 feet (NAVD 1988, 2001 adj.) along the entire length of the main dam embankment. This is approximately 36 feet above the stream bed up to its highest point. In addition, Barker Dam also has a spillway on either end that is armored with a concrete apron. The spillway's crest elevation at the northern end of the dam is reported to be 105.5 feet, and, at the southern end of the dam, the other spillway's crest elevation is 106.7 feet. The elevation of the natural ground at the ends of both spillways is reported to be 104 feet.

39.     The Government based the new design for Addicks and Barker Dams on a new Design Storm calculation, known as the Spillway Design Storm. The Spillway Design Storm

incorporated an updated probable maximum rain event, known as the Probable Maximum Precipitation. The Probable Maximum Precipitation is an updated maximum rain event and amounted to over 40 inches in 72 hours, an increase over the 30 inches in 72 hours contemplated by the Reservoirs/Dams' original design. Given storms occurring after the construction of the Reservoirs/Dams that exceeded the original design rainfall amount (such as Tropical Storm Claudette, which in 1979 dumped 43 inches of rain over just 24 hours in Alvin, Texas), the Government decided to update its design storm rainfall and account for the Spillway Design Storm in its Dams/Reservoirs' redesign.

40.     Using this Spillway Design Storm, the Corps assumed about 40 inches of runoff would be generated within each of the Addicks and Barker watersheds, along with additional runoff entering Addicks due to overflows from Cypress Creek because the Cypress Creek levee project was never constructed. Based on this Spillway Design Storm, and in accordance with standard design criteria, the Corps computed a new Maximum Design Pool level for Addicks with an elevation of 118.14 feet (NGVD 1929 with '73 adj., or about 115 feet NAVD 1988, 2001 adj.) and with a Maximum Storage Capacity in the reservoir of 330,000 acre-feet. For Barker, the Corps computed the Maximum Design Pool elevation at 110.26 feet (or about 108 feet NAVD 1988, 2001 adj.) with a Maximum Storage Capacity of 280,000 acre-feet.

41.     The Maximum Design Pool elevation of Addicks and Barker Dams/Reservoirs is a few feet higher than the lowest level of these dams' spillways. Uncontrolled releases over the spillways are within the design operation of the Addicks and Barker Dams/Reservoirs to ensure dam safety; however, the maximum pool levels that occurred in Addicks and Barker during Harvey did not reach the levels of the spillways of either dam.

42.     The Corps' use of these terms—Design Storm, Probable Maximum Precipitation, Maximum Design Pool—and the calculations contained in the Corps' own studies and documentation demonstrate that an event like Harvey, in terms of the amount of rain and stormwater that the Reservoir/Dams would have to sustain, was not only foreseeable, but also foreseen.

**The Corps Acquired Far Less Land Than Needed for the "Maximum Design Pool"**

43.     When acquiring title to land to store water behind the dams, the Government acquired fee simple title to approximately 12,460 acres for Addicks Dam/Reservoir, associated with lands having an approximate elevation of up to only 103.1 feet (NAVD 1988, 2001 adj.). The Government acquired 12,060 acres for Barker Dam/Reservoir, up to an approximate elevation of only 95 feet.

44.     Crucially, the amount of land acquired for the two reservoirs represented less than the full amount of lands that would be expected to be inundated within the Maximum Design Pool associated with the Spillway Design Storm of over 40 inches of rain in 72 hours.

45.     Rather than acquire the full amount needed for the Maximum Design Pool, the Government obtained title to land inside Addicks and Barker Reservoirs sufficient to hold about only half the amount of rain associated with the Spillway Design Storm.

46.     According to the Corps, the Government acquired land within the pool level similar to the 100-year flood pool level (that is, property expected to have a 1% chance of being flooded during any given year). Because, according to the Government's own computations, the Spillway Design Storm would produce a pool level greatly exceeding the 100-year flood event, flooding of private property outside the federally acquired land was inevitable and intended.

47.     Within Addicks Reservoir, the elevation of the 100-year flood pool is reported to be 100.5 feet (NAVD 1988, 2001 adj.). The Government acquired land in Addicks up to

approximately 103.1 feet of elevation (NAVD 1988, 2001 adj.). This is several feet of elevation short of the Maximum Design Pool of approximately 115 feet, meaning the Government does not own, or have any legal right to utilize for any public purpose, the land between 103.1 feet to approximately 115 feet elevation.

48.     Within Barker Reservoir, the elevation of the 100-year flood pool is reported to be 97 feet (NAVD 1988, 2001 adj.). The Government acquired land in Barker up to approximately 95 feet of elevation. This is several feet of elevation short of the Maximum Design Pool of approximately 108 feet. The Government thus does not own land from 95 feet to approximately 108 feet elevation.

49.     Even in its 1962 Reservoir Regulation Manual, the Corps data showed inadequate land acquisition for these two reservoirs. For Addicks Reservoir, the Corps lists the area of government-owned land as 12,795 acres and the land area associated with the Design Storm as 17,080 acres. The Manual shows that the Government knew that the Maximum Design Flood Pool would inundate up to 4,285 acres of private land within the Addicks Reservoir.

50.     For Barker Reservoir, the Corps lists the area of government-owned land as 12,110 acres and the land area associated with the Design Storm as 16,705 acres. The Manual shows that the Government knew that the Maximum Design Pool would inundate up to 4,595 acres of private land within the Barker Reservoir.

51.     Yet the Corps did not acquire, and never has acquired, the full acreage necessary to contain the impounded waters on Government-owned land for a storm event that it *knew* would fill the two reservoirs to their Maximum Design Flood Pool; nor did the Corps acquire flowage, drainage, or flood easements for this remaining private land within the Maximum Design Flood Pool.

13

**The Corps' Normal Procedure is to First Close the Gates,
Then Open the Gates During Significant Storms Like Harvey**

52.     In building Addicks and Barker Dams/Reservoirs, the Government intended to reduce flood damages to downstream properties along Buffalo Bayou resulting from storm events that produce damaging stormwater flows.

53.     The Corps has several written procedures for Addicks and Barker, a main one being the 2012 Water Control Manual. This Manual describes the "primary objective" for Addicks and Barker Reservoirs is to use them to maximize their available storage to prevent damaging flooding downstream.

54.     Thus, when rain falls in the Buffalo Bayou watershed below the dams, such as during Harvey, the Corps closes all of the gates of Addicks and Barker to prevent any release of stored waters downstream until after the rainfall event. The dams are designed and used to impound all stormwater from their upstream watersheds during such events. It is also normal procedure to keep the gates closed even when the flood pool exceeds Government-owned land and floods private property. The Corps monitors pool elevations and rates of rise in pool elevations.

55.     If the flood pool behind these dams reaches a certain elevation and is anticipated to continue to rise, then normal procedure is to open the gates and release water downstream, to both optimize reservoir storage capacity and to protect the integrity of the dams. This technique—known as "induced surcharge"—is common to many Corps reservoirs. The 2012 Water Control Manual for Addicks and Barker establishes the calculated "induced surcharge" release schedule for both Reservoirs. The 2012 Water Control Manual for Addicks and Barker does not include any "induced surcharge" release procedures specifically to avoid the intended inundation of non-federal property of the upstream Plaintiffs.

56.     During Harvey, the Corps first closed the gates according to normal procedure. The Corps later opened the gates and released water downstream because that was the normal procedure. The Corps did not open the gates and release water downstream to protect upstream Plaintiffs during Harvey.

### The Corps Knew and Foresaw that the Expected Use of the Federal Reservoirs Would Flood Private Property

57.     In the Corps' 1986 Master Plan Update (Design Memorandum No. 3), the Government made clear statements that recognized the impact on the property, located within these reservoirs that it had never acquired, by the anticipated use of these reservoirs. For example, the Corps stated: "Addicks and Barker Reservoirs were constructed for the single purpose of flood control. All lands within the project boundaries are required for impoundment of water to maximum design water surface elevations. Any development or facilities located within the project boundaries are subject to inundation." 1986 Master Plan Update, at 16.

58.     Critically, the Corps has conceded that its Maximum Design Pool extends beyond federal property and that this design feature of its dams/reservoirs would eventually result in lawsuits against the Government. In a section entitled 'Special problems: Flooding of Non-Federal Lands,' the Corps admitted:

> The maximum pool elevation for both reservoirs extends beyond each project boundary. As the surrounding areas are developed, this may mean that **homes in adjacent subdivisions may be flooded. This could result in lawsuits against the Corps of Engineers for flooding private lands**.

1986 Master Plan Update, at 116.

59.     Further, in clear awareness of the problem at hand, the Corps identified two solutions:

> **One solution to this problem would be to acquire all lands to the maximum pool elevation at each project. Other solutions would be to acquire flowage**

15

**easements and to work with local governments to establish zoning laws which would limit development in these areas.**

1986 Master Plan Update, at 116–17.

60.     But the Government did nothing. Instead, private land within the Corps' Maximum Design Pools remained open to development, and thousands of homes and businesses have been built in these two reservoirs.

61.     If the Government had adopted either solution it identified as early as 1986, damage to development inside the reservoirs, such as was suffered by Plaintiffs, could have been prevented, or the Government would have paid for the right to flood these properties within the project boundaries of its reservoirs.

62.     For example, had the Government acquired all of the land up to the Maximum Design Pool elevation in each reservoir, no private lands would have been damaged by inundation of water behind these dams.

63.     Alternatively, if the Government had acquired a flowage easement on private lands up to the Maximum Design Pool elevation in each reservoir, development may have been restricted or curtailed, and purchasers of this property would have received warning and notice. Such a flowage easement would have factored into the pricing and fair market value of the properties to be sold.

64.     Nor was this the last time the Government ignored the coming flood disaster caused by its design of the Addicks and Barker Dams/Reservoirs. In a 2009 "Master Plan," the Corps identified that the elevation of government-owned land would be exceeded by the "maximum possible pool before water spills around the end of the dam." 2009 Master Plan, at B-3 and B-4. The Government acknowledged that it only owned land sufficient to impound floodwaters up to an elevation of about 103 feet in Addicks and 95.5 feet in Barker, and that

when the reservoir impounds and stores floodwaters at higher elevations, the impounded water would exceed the footprint of the Government-owned land and be stored on private property.

65.     In the same 2009 document, the Corps continued:

Despite numerous major flood events in the Metropolitan Houston area since 1963 when the remaining two conduits at each dam were gated, Addicks and Barker Reservoirs have not exceeded the limits of government-owned land in any flood event . . . . However, **had some of these events been centered over Addicks and Barker Reservoirs or the Upper Buffalo Bayou Watershed, the combined rainfall and runoff could have resulted in flood pools exceeding the limits of government owned land and possibly exceeding the capacity of Addicks and Barker Dams.**

*Id*.

66.     Likewise, in its 2012 updated Water Control Manual, the Corps identified the surface area of Government-owned land as 13,016 acres for Addicks, with a storage capacity on Government-owned land being 127,591 acre-feet. *See* 2012 Water Control Manual, at A-2. The storage capacity within the Addicks Reservoir below its concrete-lined spillways is in excess of 200,000 acre-feet, much more than is available on Government-owned land. For Barker, the 2012 Water Control Manual identified the surface area of Government-owned land as 12,036 acres with a storage capacity on Government-owned land being 82,921 acre-feet. *See* 2012 Water Control Manual, at A-2. Again, the storage capacity within the Barker Reservoir below its concrete-lined spillways is in excess of 200,000 acre-feet, much more than is available on Government-owned land.

67.     And in the 2012 Water Control Manual, the Corps *again* predicted that rain events would flood residential developments outside the federal property:

Acquisition of real estate was based on the original design. Presently, **pool levels in excess of Government-owned land *will damage* residential developments adjacent to Government-owned lands.**

2012 Water Control Manual, at 7-1 (emphasis added).

68.     These documents demonstrate that the Government knowingly and intentionally designed the Maximum Design Pools of Addicks and Barker Dams/Reservoirs to extend beyond federal property and to store water on private property, including private residential subdivisions, without obtaining and paying for the right to do so. The Government foresaw the potential for widespread flooding and inundation of such private property, yet took no action to prevent it. In fact, the Government predicted that it would be sued when a major storm that it had reasonably anticipated to occur would, in fact, occur and inundate private property located within these reservoirs. And here we are.

69.     Moreover, not only did the Government previously intend, it *still* intends to store its floodwaters on the private property that is located within the Maximum Design Pools of these two reservoirs. To this extent, future flooding of such property is equally foreseeable.

70.     As of the date of this Complaint, the Government is continuing to use the Addicks and Barker Dams/Reservoirs in a manner that will store impounded water on private property as a result of major storm events without obtaining and paying for the right to do so.

### The Corps Knowingly and Foreseeably Flooded Thousands of Homes Upstream of Addicks and Barker Dams During Tropical Storm Harvey

71.     Three decades after the Government predicted its two dams/reservoirs would flood private properties located within their design pools, Tropical Storm Harvey brought several days of rain, which did just that. Just as the Corps intended, the property within these design pools, including thousands of homes and businesses, flooded. The invasion on, and impact of, Harvey floodwaters on Plaintiffs' real and personal property was the direct, natural, or probable result of the Corps' authorized activity—namely, the design, construction, and use of Addicks and Barker Dams/Reservoirs.

72.     During Tropical Storm Harvey, the water level in Addicks Reservoir reached a maximum elevation of 109.1 feet (NAVD 1988, 2001 adj.), well above the 103.1-foot elevation associated with federally owned lands, but still *less* than the Government's Maximum Design Pool of 115 feet and the spillway crest elevations at Addicks—meaning the impact of the Government's intentional actions could have been even worse still. Consistent with Addicks Dam/Reservoir's design, the Government therefore stored floodwaters on all private properties above 103.1 feet of elevation but below 109.1 feet of elevation without having any right to do so. The floodwaters did not fully recede from many of these private properties for more than a week.

73.     During Tropical Storm Harvey, the water level in Barker Reservoir reached a maximum elevation of 101.5 feet (NAVD 1988, 2001 adj.), well above the 95 foot elevation associated with federally owned lands, but *less* than the Government's Maximum Design Pool of about 108 feet. Consistent with Barker Dam/Reservoir's design, the Government therefore stored floodwaters on all private properties above 95 foot elevation but below 101.5 feet without having any right to do so. Many of these private properties remained flooded for more than a week.

74.     The following diagrams illustrate the relevant pool level elevations for Addicks and Barker:





75.     The Government's authorized action was its design, construction, and use of its two flood control projects, Addicks and Barker Dams/Reservoirs, in a manner that it knew would flood private lands located within its reservoirs' Maximum Design Pools during foreseeable and anticipated storm events.

76.     Consistent with the Reservoir's design and using data from the Corps' 2012 Water Control Manual, the flood pool elevation in Addicks during Harvey occupied at least 16,989 acres. The amount of water impounded was at least 217,896 acre-feet. *See* 2012 Water Control Manual, at Table 7-01, page 22.

77.     Consistent with the Reservoir's design and using data from the Corps' 2012 Water Control Manual, the flood pool elevation in Barker during Harvey occupied at least 15,117 acres. The amount of water impounded was at least 170,034 acre-feet. *See* 2012 Water Control Manual, at Table 7-01, page 22.

78.     Thus, according to the Corps' 2012 Water Control Manual, the Government impounded 90,305 acre-feet of stormwater on at least 3,973 acres of private land in Addicks Dam/Reservoir during Harvey; and 87,113 acre-feet of stormwater on at least 3,081 acres of private land in Barker Dam/Reservoir during Harvey. 2012 Water Control Manual, at Table 7-01, page 22. In total, the Government impounded an additional 177,418 acre-feet of stormwater

beyond Government-owned land behind and upstream of Addicks and Barker Dams and within their reservoirs, inundating and damaging at least 7,054 acres of private property.

79.     And even though floodwaters in both Addicks and Barker Reservoir did not reach the peak elevation of their respective Maximum Design Pool, all private properties below the Maximum Design Pool faced, and continue to face, the risk of intentional inundation by the Government.

80.     The amount of rainfall during Harvey was less than the amount the Dams/Reservoirs were designed to handle. Therefore, the Harvey rain amount was foreseeable and cannot be defended as an 'act of God.'

**Harvey was Not the First Flood for Many Property Owners, and It Will Not be the Last**

81.     Harvey was not a "one off" flood event for the upstream property owners who flooded during Harvey. It was the second flood for certain neighborhoods. It will not be the last flood for property owners within the Maximum Design Pool of these reservoirs. Flooding will happen again during future heavy storm systems, just as the Corps predicted when it designed, constructed, and uses these dam/reservoir projects.

82.     Certain neighborhoods located within the Addicks Reservoir flooded in the so-called Tax Day Flood of 2016. Among the neighborhoods are Bear Creek and Concord Bridge. Two of the named Plaintiffs, Ms. Virginia Holcomb and Mr. Glenn Peters, live in those neighborhoods.

83.     Property in those neighborhoods generally, and Ms. Holcomb's and Mr. Peters' properties in particular, flooded during the 2016 Tax Day Flood for the same reason that property owners in Harvey flooded: because their properties are situated within the Maximum Design Pools of the federal reservoirs and the Government intends them to store floodwaters during certain major storm events.

84.     The flooding of the "upstream" property owners is not the product of a one-time decision by the Corps to implement an emergency procedure that it did not foresee or anticipate. Rather, it is the product of the Corps' design and construction of these projects and knowledge that during foreseeable and anticipated storm events, these dams would capture and store floodwaters within their respective reservoirs beyond Government-owned lands and up to their respective Maximum Design Pool levels.

### Individual Allegations

85.     During Harvey, both Addicks and Barker Dams/Reservoirs stored floodwaters on lands within the Maximum Design Pools of the reservoirs. The floodwaters stored within both reservoirs exceeded the boundaries of federally owned property. The Government stored its floodwaters on property owned by the Plaintiffs.

86.     Plaintiff Micu owns private property at 6411 Canyon Park Drive in Barker Reservoir. She suffered significant damage to the house structure, the contents of her home, and to her property value. She was displaced from her home. Her private property lies beneath the elevation of the Maximum Design Pool of the Barker Reservoir. When the United States intentionally impounded water in Barker Reservoir up to 101.5 feet during Harvey, Ms. Micu's private property was flooded, just as the United States intended and designed it to do.

87.     Plaintiff Rodriguez owns private property at 6215 Pebble Canyon Court in Barker Reservoir. She suffered significant damage to the house structure, the property fair market value, and also lost rental income, because she used this house as rental property. She has lost the benefits and profits attendant to the continued operation of her commercial venture. Her private property lies beneath the elevation of the Maximum Design Pool of the Barker Reservoir. When the United States intentionally impounded water in Barker Reservoir up to

101.5 feet during Harvey, Ms. Rodriguez's private property was flooded, just as the United States intended and designed it to do.

88.     Plaintiff Schroeder owns private property at 19914 Sky Hollow Lane in Barker Reservoir. He suffered significant damage to the house structure, the contents of his home, and to his property value. He was displaced from his home. His private property lies beneath the Maximum Design Pool of the Barker Reservoir. When the United States intentionally impounded water in Barker Reservoir up to 101.5 feet during Harvey, his private property was flooded, just as the United States intended and designed it to do.

89.     Plaintiff Popovici owns private property at 19927 Parsons Green Court in Barker Reservoir. The Government stored floodwaters on her property during Harvey, but the floodwaters did not enter her home. When the United States intentionally impounded water in Barker Reservoir up to 101.5 feet during Harvey, her private property was flooded, just as the United States intended and designed it to do. Although she did not suffer damage associated with lost contents, the fair market value of her property has declined because it has been used for floodwater storage and will be so used again.

90.     Plaintiff Soares owns private property at 20526 Indian Grove Lane in Barker Reservoir. He suffered significant damage to the house structure, the contents of his home, and to his property value. He was displaced from his home. His private property lies beneath the Maximum Design Pool of the Barker Reservoir. When the United States intentionally impounded water in Barker Reservoir up to 101.5 feet during Harvey, his private property was flooded, just as the United States intended and designed it to do.

91.     Plaintiff Ageyeva owns private property at 12619 Wilbury Park in Addicks Reservoir. She suffered significant damage to the house structure and the contents of her home,

and to her property's fair market value. Her private property lies beneath the Maximum Design Pool of Addicks Reservoir. When the United States intentionally impounded water in Addicks Reservoir up to 109.1 feet of elevation during Harvey, Ms. Ageyeva's private property was flooded, just as the United States intended and designed it to do.

92.     Plaintiff Peters owns private property at 13639 Harpers Bridge Drive in Addicks Reservoir. He suffered significant damage to the house structure and the contents of his home, and to his property's fair market value. His private property lies beneath the Maximum Design Pool of Addicks Reservoir. When the United States intentionally impounded water in Addicks Reservoir up to 109.1 feet of elevation during Harvey, his private property was flooded, just as the United States intended and designed it to do. Mr. Peters property flooded for the second time in Harvey. The first time it flooded was during the Tax Day Flood of 2016, when water was stored on his property but did not enter his home.

93.     Plaintiff Holcomb owns private property at 16510 Loch Maree Lane in Addicks Reservoir. She suffered significant damage to the house structure, the contents of her home, and to her property's fair market value. Her private property lies beneath the Maximum Design Pool of Addicks Reservoir. When the United States intentionally impounded water in Addicks Reservoir up to 109.1 feet of elevation during Harvey, Ms. Holcomb's private property was flooded, just as the United States intended and designed it to do. Her property flooded for the second time in Harvey. The first time it flooded was during the Tax Day Flood of 2016, when floodwaters entered her home, damaged the structure of her home and the contents inside.

94.     Plaintiffs did not know their private property was located in the design pools of the federal reservoirs. All Plaintiffs' investment-backed expectations in their properties were

centered on the safety and security of their residential subdivisions, or safety of the commercial developments, with no expectation of flooding from being inside a flood control reservoir.

95.     Certain neighbors of Plaintiffs have sold their homes, and real estate sales confirm significant property losses and permanent damage. These post-storm sales already show approximately 50% devaluation in property values.

96.     In addition to the diminution of property value, portions of Plaintiffs' homes have been destroyed—necessitating tearing out soiled walls, removing mold-prone insulation, replacing ruined floors, replacing garage doors and other exterior features, and requiring the repair of other structural issues.

97.     In addition to the real property destroyed, Plaintiffs whose homes flooded suffered permanent damage, destruction, and tragic loss of personal property including appliances, furniture, air conditioning units, and numerous personal effects. For those in one-story houses, such as Plaintiff Peters and Plaintiff Holcomb, this loss of property amounts to most of their possessions.

98.     For those Plaintiffs using the property for commercial purposes, such as Plaintiff Rodriguez, Plaintiffs have been deprived of the benefits and profits attendant to the continued operation of any of their commercial ventures, all as a direct, natural, or probable consequence of these federal projects. Plaintiffs seek full economic damages to which they are entitled.

99.     The Government does not own any right to store floodwater on these Plaintiffs' private property. The Government has never made an offer to Plaintiffs to purchase an easement or other property interest for the storage of floodwaters. The Government has never attempted to use its power of eminent domain to acquire an easement or other property interest from

Plaintiffs for the purpose of storing floodwaters. The Government has never compensated or offered to compensate Plaintiffs to use their property to store floodwaters.

100. The Government designed, constructed, and uses the Addicks and Barker Dams/Reservoirs for a public purpose, namely to prevent flooding downstream along Buffalo Bayou and in downtown Houston. Consistent with their design, the Government intended to store floodwaters on the private property of Plaintiffs and the Putative Class members during heavy rains such as Harvey, in order to prevent widespread flooding downstream in the City of Houston.

## Class Allegations

101. In addition to asserting claims on their own behalf, Plaintiffs bring this action as a class action under Rule 23 of the U.S. Court of Federal Claims (RCFC 23). Plaintiffs seek to represent the following Putative Class:

> Individuals, businesses, or others leasing or owning non-federal and/or private real property and personal property, which was located within the Government's Maximum Design Pools of Addicks Reservoir (115 feet) or Barker Reservoir (108 feet) and that flooded during Hurricane/Tropical Storm Harvey in August/September, 2017.

102. Excluded from the Putative Class are the Government and its personnel, the Court, and Court personnel.

103. The elements of RCFC 23(a) and (b) can be grouped into five categories: (i) numerosity—a class so large that joinder is impracticable; (ii) commonality—in terms of the presence of common questions of law or fact, the predominance of those questions, and the treatment received by the class members at the hands of the United States; (iii) typicality—that the named parties' claims are typical of the class; (iv) adequacy—relating to fair representation;

and (v) superiority— that a class action is the fairest and most efficient way to resolve a given set of controversies.

104.    Under RCFC 23(a)(1), the "numerosity" requirement, the proposed class is so numerous that joinder is impracticable. The Putative Class comprises thousands of properties located in Harris and Fort Bend Counties and contains at least 10,000 members.

105.    Under RCFC 23(a)(2), the "commonality" requirement, there are questions of law and/or fact common to the class that support certification. The claims of potential class members depend on common legal and factual contentions that are capable of class-wide resolution. Legally, liability is uniform across the class: whether the Government violated the Fifth Amendment by intentionally impounding floodwaters on the Putative Class' private property during Harvey. The determination of liability also turns on common facts: the action of the United States in designing, constructing, and using the Addicks and Barker Dams/Reservoirs, with the direct, natural or probable consequence of these federal projects being the taking of the Putative Class' property without just compensation.

106.    Additionally, the questions of law and fact common to the Proposed Putative Class plainly predominate over any questions affecting only individual members of the Putative Class. As stated, liability is clearly a common issue. More generally, the common legal and factual questions, which do not vary from member to member of the Putative Class, and which may be determined without reference to the individual circumstances of any Putative Class member potentially include:

   a. Whether the inundation, destruction, damage, and/or devaluation of Plaintiffs'
      and the Putative Class members' real and/or personal property caused by the
      Government's intentional storage of floodwaters within the Maximum Design
      Pool of the Addicks and Barker Reservoirs during August/September 2017
      constitutes an unconstitutional taking of Plaintiffs' and Putative Class
      members' property by the Government without just compensation;

27

    b. Whether by intentionally storing flood water within the Maximum Design Pools of the Addicks and Barker Reservoirs during August/September 2017 and inundating, destroying, damaging, and/or devaluing Plaintiffs' and Putative Class members' property and businesses, the Government caused a taking of Plaintiffs' and Putative Class members' constitutionally protected property interests without just compensation;

    c. Whether the inundation, destruction, damage, and/or devaluation of Plaintiffs' and the Putative Class members' real and/or personal property was the natural, probable, and reasonably foreseeable consequence of the Government's intentional storage of floodwaters within the Maximum Design Pool of the Addicks and Barker Reservoirs during August/September 2017;

    d. Whether the inundation of Plaintiffs' and Putative Class members' real and/or personal property resulted in the destruction of, substantial damage to and/or devaluation of their real and/or personal property;

    e. The proper measure of the just compensation or other appropriate relief for the Plaintiffs and Putative Class members for which the Government is liable. The proper measure of damages includes but is not limited to: the diminution of the real property fair market value; the cost to repair or replace real property improvements; loss and permanent damage to personal property, lost rental value, all plus interest.

107.   Under RCFC 23(a)(3), the "typicality" requirement, the claims of the representative parties and parcels are typical of the claims of the proposed class. Plaintiffs and members of the Putative Class were inundated by the floodwater intentionally stored by the Government on and over their real and personal property in August/September 2017 in the same manner. The relief Plaintiffs seek is common to the relief required by the Putative Class members.

108.   Further, under RCFC 23(a)(4), the "adequacy" requirement, Plaintiffs, as the Putative Class' representatives, will fairly and adequately protect the interests of the class. Plaintiffs' interests are consistent with and not antagonistic to those of the Putative Class it seeks to represent. Plaintiffs and members of the Putative Class all own property within the design

pools of Addicks or Barker Reservoirs, have had their property taken, sustained actual pecuniary losses, and seek just compensation under the Fifth Amendment.

109.    Plaintiffs have no interests that are adverse to, or which conflict with, the interests of members of the Putative Class and are ready and able to fairly and adequately protect the interests of the Putative Class. Plaintiffs strongly believe the United States must provide just compensation for taking private property located within the Maximum Design Pools in Addicks and Barker Reservoirs which flooded during Harvey and have asserted viable claims for takings under the Fifth Amendment. Plaintiffs will diligently pursue those claims. If necessary, Plaintiffs may seek leave of the Court to amend this Complaint to include additional class representatives to represent the Putative Class or additional claims as may be appropriate.

110.    Plaintiffs are represented by experienced, qualified, and competent counsel who are committed to prosecuting this action. Counsel is knowledgeable about, and experienced in, conducting class action litigation, complex multi-plaintiff litigation, takings litigation, and flooding litigation. Counsel has and will continue to devote the appropriate resources necessary to prosecute these claims.

111.    Finally, for the "superiority" requirement, a class action is the superior and most efficient vehicle for resolving the takings claims, for both the Court and for the litigants. In this case, a class action promotes judicial economy while still maintaining fairness to Putative Class members.

112.    A class action will result in the most fair and efficient adjudication of this controversy. Given the number of affected individuals, individual litigation of the claims of all Class Members is highly impractical. Even if every member of the Putative Class could afford to pursue individual litigation, the Court system could not. It would be unduly burdensome to this

Court to hear thousands of individual cases. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues.

113.    By contrast, maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each Putative Class member. Plaintiffs anticipate no difficulty in managing this action as a class action.

114.    For these reasons, maintaining this action as a class action pursuant to RCFC 23 is appropriate.

## CAUSES OF ACTION

### Count I: Violations of the Takings Clause of the
### Fifth Amendment of the United States Constitution

115.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Class Action Complaint.

116.    For the public's benefit and the benefit of certain areas, including downstream properties along Buffalo Bayou and downtown Houston, the Government constructed Addicks and Barker Dams/Reservoirs and intends to store floodwaters up to the Maximum Design Pools of the two reservoirs during heavy rains.

117.    By storing stormwaters on private property within the Maximum Design Pools of Addicks and Barker Reservoirs during Harvey, the Government violated the Takings Clause of the Fifth Amendment because it took the Plaintiffs' and Putative Class members' real and personal property without paying just compensation.

118.    The Government's design of the Maximum Design Pools of Addicks and Barker Reservoirs at elevations that encompass significant private property demonstrates and confirms the Government's permanent commitment to the intermittent, but recurring, flooding of Plaintiffs' and Putative Class members' real and personal property and businesses, should heavy rain events occur again. Indeed, by the Corps' own admission, certain neighborhoods in the Addicks area flooded in 2016 for this reason.

119.    The Government's actions during Harvey violated Plaintiffs' and the Putative Class members' protectable property rights. Specifically, Plaintiffs and members of the Putative Class own or lease real property and own personal property, which was damaged or destroyed by the Government. Their rights to this property is recognized and protected under Texas law.

120.    Further, the Government's actions ran counter to Plaintiffs and the Putative Class members' reasonable investment-backed expectations in the safety and security of the residential and commercial properties that they rented or owned. Plaintiffs and Putative Class members did not know they were located within the Maximum Design Pool of Addicks and Barker Reservoirs and did not expect to flood as a result of the Government's actions.

121.    As discussed extensively in this complaint, the Government foresaw and predicted the taking of Plaintiffs' and Putative Class members' real and personal property. For example, in a 1986 document, the Corps predicted and explained: "[The] maximum pool elevation for both reservoirs extends beyond each project boundary. As the surrounding areas are developed, this may mean that homes in adjacent subdivisions may be flooded. This could result in lawsuits against the Corps of Engineers for flooding private lands." In a 2012 document, the Corps confirmed: "Presently, pool levels in excess of Government-owned land will damage residential developments adjacent to Government-owned lands."

122.    The Corps designed, constructed, and used its two flood control projects, Addicks and Barker Dams/Reservoirs, in a manner that it knew would result in the flooding of private lands located within its reservoirs' Maximum Design Pools during foreseeable and anticipated storm events. During Harvey, the Corps closed the gates of Addicks and Barker according to standard procedures.

123.    Alternatively, even if the Government did not actually foresee the taking of Plaintiffs' and Putative Class members' real and personal property, the Government's actions in connection with the design, construction, and use of the reservoirs were undertaken with disregard for the consequences to Plaintiffs' and Putative Class members' properties. And, because the consequences to Plaintiffs' and Putative Class members' properties were the direct, natural, and probable result of authorized activities by the Government, the Government's intent to invade the Plaintiffs' protected property interests may be inferred.

124.    The damage is unquestionably substantial. As is common in cases of government-induced flooding that unconstitutionally takes and destroys property, the Government's taking is temporary because the flooding itself does not continue permanently. But the consequences of the flooding include the permanent destruction and loss of real and personal property, including homes and businesses.

125.    The Government's action was the cause-in-fact of the taking. The storage and invasion of floodwaters onto Plaintiffs' real and personal property was the direct, natural, or probable result of the Corps' authorized activity.

126.    As a direct, natural, and probable consequence of the Government's design, construction and use of the Addicks and Barker Dam/Reservoir projects, including the continued use attendant to these projects, Plaintiffs have been deprived of the use, occupancy, and

enjoyment of their immovable property (both the land and any improvements), resulting in a permanent taking of their property for a public use, without payment of just compensation.

127.    A taking becomes ripe when the Government uses the property of a plaintiff. For Plaintiff Peters and Plaintiff Holcomb, a taking first occurred in 2016. For the remaining Plaintiffs, the taking of their properties first occurred when floodwaters were stored during Harvey. The Corps itself has recognized that the first flooding event, where floodwaters exceeded government owned land, occurred in the Tax Day Flood of 2016.

### Count II: Taking of Flowage and Drainage Servitudes
### Without Just Compensation in Violation of the Fifth Amendment

128.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Class Action Complaint.

129.    The flooding of Plaintiffs' property is recurring and is necessarily incident to, and an inevitable consequence of, the continued use of the Addicks and Barker Dam/Reservoir projects by the Government.

130.    As a direct, natural, and probable consequence of the Addicks and Barker Dam/Reservoir projects, including the continued use attendant to these projects, Plaintiffs' properties have been subjected to actual flooding and/or the continued risk of frequent and inevitably recurring flooding. Because the Government's actions in connection with the Addicks and Barker Dam/Reservoir projects were undertaken with disregard for the consequences to Plaintiffs' properties, and because the consequences to Plaintiffs' properties were the direct, natural, and intended result of authorized activities by the Government in connection with the Addicks and Barker Dam/Reservoir projects, the Government's intent to invade Plaintiffs' protected property interests is clear.

131.    Consequently, the Government has taken a flowage and drainage easement on Plaintiffs' properties without compensation. As a result of the foregoing, and in addition to, or in the alternative to, the other causes of action asserted herein, the United States has taken permanent easements or servitudes of flowage and drainage over Plaintiffs' property, which it has permanently taken for a public purpose, without just compensation.

## PRAYER

Plaintiffs pray that the Court:

A.      Maintain and certify this matter as a class action on behalf of: Individuals, businesses, or others leasing or owning non-federal and/or private real property and personal property, which was located within the Government's Maximum Design Pools of Addicks Reservoir (115 feet) or Barker Reservoir (108 feet) and that flooded during Tropical Storm Harvey in August & September, 2017;

B.      Enter judgment in Plaintiffs' favor, individually and on behalf of all persons similarly situated, and against the United States of America, finding that as a direct result of (i) the inundation of, destruction of, substantial damage to, and/or devaluation of Plaintiffs' and Putative Class members' real and personal property and businesses, by the Government's intentional storage of water within the Design Pools of Addicks and Barker Dams/Reservoirs in August & September 2017; or (ii) the Government temporarily taking, exceeding, and/or expanding flowage easements over Plaintiffs' and Putative Class members' property, with devastating consequences to the property interests of Plaintiffs and Putative Class members, the Plaintiffs and Putative Class members are entitled to recover just compensation and such other appropriate relief as the Court deems just and proper in an amount to be determined by the trier of fact. The losses

sustained by Plaintiffs and Putative Class members were reasonably foreseeable by the Government.

C.       Award Plaintiffs their reasonable and necessary attorney's fees, litigation expenses, and court costs, including appraisal, expert witness, and engineering fees, pursuant to 42 U.S.C. § 4654(c), plus appropriate interest, compounded (per USCFC jurisprudence), legal interest pursuant to 28 U.S.C. § 1961, 28 U.S.C. § 1920, and/or CFC Rule 23(h); and,

D.       Award Plaintiffs all other general, legal and equitable relief which this Court is empowered to provide, and to which Plaintiffs are entitled.

> Respectfully submitted,
>
> IRVINE & CONNER PLLC
>
> by: *s/ Charles Irvine*
>     Charles Irvine, *Attorney of Record*
>     Mary Conner
>     Kristin Schlemmer
>     Michael McEvilly
>     4709 Austin Street
>     Houston, Texas 77004
>     713-533-1704
>     713-524-5165 (fax)
>     charles@irvineconner.com
>
> ***Counsel for Plaintiffs***

OF COUNSEL                          OF COUNSEL
Lawrence G. Dunbar                  Daniel Charest
Dunbar Harder PLLC                  Warren Burns
One Westoffice Center               Larry Vincent
10590 Westoffice Drive              Will Thompson
Suite 2000                          Burns & Chares LLP
Houston, Texas 77042                900 Jackson Street, Suite 500
713-782-4646                        Dallas, Texas 75202
ldunbar@dunbarharder.com            469-904-4550
                                    dcharest@burnscharest.com

**Certificate of Service**

I, Charles Irvine, certify that on November 15, 2017, I filed and served this document on all counsel of record through the Court's electronic filing system.

*/s/ Charles Irvine*
Charles Irvine