**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| IN RE ADDICKS AND BARKER (TEXAS) FLOOD-CONTROL RESERVOIRS | |
| THIS DOCUMENT APPLIES TO: | MASTER DOCKET NO. 17-300L |
| ALL CASES | |

**THE JEC GROUP'S SUPPLEMENTAL STATEMENT OF INTEREST
IN REPRESENTING THE DOWNSTREAM CLASS**

The JEC Group[1] has already submitted papers explaining their qualifications and why they believe they could ably serve as lead of the downstream class cases. This supplemental statement addresses some additional issues that were the subject of discussion at the November 1 hearing: conflicts, efficient leadership structures, and scheduling and sequencing concerns.

**I.    Conflicts Inherent to this Litigation Require Appointment of Separate Lead Counsel to Represent Disparate Interests.**

As the JEC Group pointed out in their opening papers, this case is fraught with conflicts. Most obviously, there is an actual and irreconcilable conflict between upstream and downstream plaintiffs. *See Tita v. United States*, No. 17-cv-1461, Dkt. No. 13 at 7-9 (Fed. Cl. Oct. 20, 2017). Those conflicts lead to the inescapable conclusion that separate lead counsel should be appointed to represent the disparate classes and the individuals that fall within those classes. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999) (*Amchem* requires a class divided

---

[1]    The JEC Group represents plaintiffs Christopher and Ijang Tita in *Tita v. United States*, No. 17-cv-1461 (Fed. Cl. Oct. 5, 2017).

1

between holders of disparate claims to have "separate representation" in order to "eliminate conflicting interests of counsel.").

Some proposed lead counsel, seeking to represent every single claimant in this case, have proposed to resolve this conflict by adding to their leadership team layers upon layers of committees that supposedly represent each of lead counsel's clients' disparate interests. But this changes nothing; lead counsel in any event remain in the position of simultaneously representing two factions of clients with disparate interests. That is untenable. *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 232 (2d Cir. 2016) (citing *Ortiz*, 527 U.S. at 856). The only way to effectively avoid the very real conflicts among the competing plaintiff groups is to appoint separate lead counsel for each.

Attorneys' fees underlie another tension, this one between individual and class cases: any attorney who simultaneously represents individuals (on a contingent basis) and a class (on a fee-shifted lodestar basis) is likely to face a strong financial incentive to steer clients towards individual proceedings. This tension will come to a head during the post-certification notice period, when both class counsel and individual counsel should be provided with an opportunity to describe (in language subject to Court approval) the respective pros and cons of proceeding on a class versus individual basis.[2] Though this tension is far less

---

[2] The JEC Group's position will be clear: they will explain how a class action will resolve more quickly for all but the few individuals who are selected for bellwether trials (and even there, the class should proceed at the same pace). Further, they will explain that, because the class lawyers are limiting themselves to

problematic than the upstream/downstream conflict, it is nevertheless sufficiently concrete to merit separate representation of class and individual plaintiffs here. *See In re Ameriquest Mortg. Co. Mortg. Lending Practices Litig.*, No. 05-cv-7097, 2006 WL 3227883, at *4 (N.D. Ill. Nov. 7, 2006). It is noteworthy that the JEC Group is the only group thus far to identify and account for this conflict.

That said, the JEC Group has conferred with the Buzbee Firm, which is seeking to be appointed Downstream Lead Individual Counsel, and is pleased to report that the two groups have agreed to coordinate their litigation efforts. The groups intend to meet regularly to discuss case management issues, and are committed, where appropriate, to continue working in complimentary ways, in order to maximize the benefits to the downstream claimants.

The JEC Group's proposed structure provides a bulwark against any actual or potential conflicts: each of the plaintiff groups will be zealously represented by lead counsel who represent only that part's interests, and after class certification, homeowners will have the opportunity to make an informed decision about which lawyers (*i.e.*, class or individual) will best represent their interests. This structure is necessary to protect all parties to this litigation from the conflict-related pitfalls attendant with hybrid class-and-mass litigation. *See generally Haggart v. United States*, 116 Fed. Cl. 131 (2014), *vacated and remanded sub nom. Haggart v. Woodley*, 809 F.3d 1336 (Fed. Cir. 2016).

---

lodestar fees paid by defendants, those opting into the class avoid the pyrrhic victory that could await those proceeding individually.

## II.  The JEC Group's Structure Is Highly Efficient

For the Court's convenience, **Figure 1** below illustrates which various plaintiff subgroup(s) each proposed lead counsel wishes to represent.

### Figure 1

| Proposed Lead Counsel | Downstream Class | Downstream Individual | Upstream Class | Upstream Individual |
|---|---|---|---|---|
| Jay Edelson | ✓ | | | |
| Tony Buzbee | | ✓ | | |
| Derek Potts | | | ✓ | |
| Charles Irvine | | | ✓ | |
| Vuk Vujasinovic | | | | ✓ |
| Steven Mitby | | | | ✓ |
| Armi Easterby | | | | ✓ |
| Lanier, Mithoff, Sigman, Frederick, et al. | ✓ | ✓ | ✓ | ✓ |
| Jack McGehee | ✓ | ✓ | ✓ | ✓ |
| Fred Hagans | ✓ | ✓ | ✓ | ✓ |

The JEC group now proposes that one lawyer from its group – Jay Edelson – serve as lead counsel for the downstream class.[3]/[4] We further propose that the Court select additional lawyers from among the remaining groups to serve as lead counsel for each of three other plaintiff subgroups: (1) the upstream class, (2) lead

---

[3]  The JEC group agrees that the downstream class will be best represented if it speaks through one voice – that of Mr. Edelson. The three other firms that comprise the JEC Group, if appointed, will form the Downstream Class Plaintiffs' Steering Committee, and will contribute to the litigation as needed, based on respective subject matter expertise.

[4]  The JEC group notes for the record that they only represent plaintiffs that fall within the downstream class.

downstream individual case(s),[5] and (3) lead upstream individual case(s).[6] This lean structure promises to be highly efficient: each homeowner will have clarity as to which lead lawyers represent their (and *only* their) interests; the government will have clarity as to who to communicate with regarding case-specific issues; and the Court will be able to manage this case without the added inefficiency attendant with having to deal with numerous lawyers on the same issues.

On the opposite end of the spectrum is the Lanier, Mithoff, Sigman Group, which seeks to be appointed lead of everything. The supplemental filings from that group demonstrate why such a structure is less than ideal here. Indeed, that group has apparently filed eight separate documents as part of their supplemental filings, *see* Dkt. Nos. 12, 13, 14, 15, 16, 17, 19, 24, at least two of which are on the same issue – but filed by different attorneys within that group, *see* Dkt. Nos. 13, 15.  The multiple and overlapping filings make clear that that group's structure is not the best fit for this case.

### III. There is No "Big Tent" Trend

There are of course some scenarios where a "big tent" leadership approach may be appropriate. But those are the exception instead of the rule. An example of one such exception, highlighted in Dkt. No. 13-1, is the Deepwater Horizon MDL,

---

[5]     As noted above, for lead of the downstream individual cases, the JEC Group recommends the Court appoint Tony Buzbee's law firm as lead counsel.

[6]     Any steering (or other) committees other lead counsel wish to establish should be staffed efficiently. *See* MCL 4th § 10.221 at 25 ("Committees of counsel can sometimes lead to substantially increased costs, and they should try to avoid unnecessary duplication of efforts and control fees and expenses.")

No. 2179. That MDL is perhaps the messiest legal proceeding in history: hundreds of thousands of plaintiffs with widely disparate circumstances (*e.g.* landowners, fishermen, hotel operators, rental companies, cities, and states) suffered a vast array of harms; dozens of defendants faced liability under widely disparate theories; and coordination was required across not only parallel state and federal proceedings but also civil and criminal dockets. The legal and factual complexities of that case – in addition to its unprecedented administrative complications – rendered appropriate a large and multifaceted leadership structure.

This litigation is quite simply nothing like the Deepwater Horizon MDL – or any of the other nationwide MDLs identified in Dkt. Nos. 13-1 and 15. The facts here are straightforward and will require little discovery compared to most major MDLs; the challenged conduct involves a single defendant – the federal government; and the legal issues, while nuanced, are likely to be resolved in perhaps a handful of briefs.

As to the purported trend: since the *Deepwater Horizon* MDL was established in October of 2011, the JPML has created more than 600 MDLs.[7] The Court has been presented with a cherry-picked selection of thirteen of them, and told that sample supports the notion of a trend towards large leadership structures. *See* Dkt. No. 13-1. Putting aside that thirteen samples from a set of 600 cannot demonstrate

---

[7]   MDL Statistics – Docket Summary Listing, available at http://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_MDL_Number-October-16-2017.pdf (last accessed Nov. 15, 2017).

a "trend," those cases: (1) are all MDLs, which require state/federal coordination as well as transferee/transferor court coordination, and (2) all feature more complex claims than those alleged this (relatively) straightforward takings case.[8]

Overall, the best way for the Court to think about how big of a leadership structure is necessary is by looking at the defendant. The government has a small, dedicated team. Although there are significant stakes for them and thus they are highly motivated to litigate the case effectively, they have reached the same conclusion as nearly every other group: that a big tent approach will bog the case down, lead to things falling through the cracks, and create inefficiencies where there were none before.

**IV.   INITIAL SCHEDULING AND SEQUENCING ISSUES**

The JEC Group respectfully proposes the following initial case schedule, based on an assumption that the Court will enter a Case Management Order ("CMO") establishing lead counsel and lead case for the four previously-identified plaintiff groups.

| **Event** | **Date** |
|---|---|
| Appointment of (4) lead counsel responsible for the respective parts of the case | Date of CMO |
| Deadline for lead counsel to file any amended pleadings | 7 days after CMO |
| Deadline for government's answer(s) and Rule 12 motions(s) | 21 days after CMO |
| Deadline for class certification motions | 45 days after CMO |

---

[8]   Ten are medical products liability cases, another two are the *Deepwater Horizon* and *Volkswagen Clean Diesel* cases, and the final is [corn md]. *See* Dkt. No. 13-1.

The JEC Group agrees that any jurisdictional motions filed by the government should be the first motions taken up by the Court. But with an eye towards expediency, the jurisdictional motions should be filed simultaneously with any other Rule 12 motions, and no stay should be entered during their pendency.

It is also imperative here that class certification be decided before summary judgment. The government, by insisting that class certification precede summary judgment, has set itself up with a prime appellate issue if the Court decides summary judgment before certification. That issue is the so-called rule against one-way intervention. *See, e.g.* 2001 Report of the Civil Rules Advisory Committee, 201 F.R.D. 560, 611 (Rosenthal, J., Chair, Class Action Subcommittee) ("A court may not decide the merits first and then certify a class.").

The one-way intervention issue becomes problematic in cases like this one, where the defendant's due process rights are at issue and the defendant objects to having summary judgment adjudicated first. William B. Rubenstein, *3 Newberg on Class Actions* § 7:10 (5th ed.). Consequently, if the Court in fact decides summary judgment first, the Government is likely to (1) oppose plaintiffs' summary judgment motions, but then (2) move under 28 U.S.C. § 1292(d)(2) for interlocutory appeal based on the one-way intervention problem (which is certainly a "controlling question of law" upon which exists a "substantial ground for differences of opinion"), and (3) in any event retain the argument for any post-trial appeal. The Court

should refrain from unnecessarily gifting the Government this three-bites-at-the-apple procedural advantage.[9]

While some argument has been made that certain courts have decided summary judgment before certification, *see* Dkt. No. 14, and thus, the Court may do so here, that analysis is incomplete. The government is pressing for a ruling on certification prior to liability, which directly implicates the rule against one-way intervention. And the cases cited in Dkt. No. 14 are inapposite: the liability determination in two of them was made on Rule 12 motions; the third at the same time as class certification; and the highlighted case – *Furlong v. United States* – dealt with scheduling (*i.e.*, whether the schedule could allow for the *filing* of summary judgment motions prior to a ruling on certification). 96 Fed. Cl. 611, 612 (2011). Notably, Judge Block never did enter summary judgment. After the summary judgment motions had been pending for nearly two years, the parties stipulated to class certification (as part of a proposed settlement) and to stay the summary judgment motions. *See Furlong v. United States*, No. 09-cv-367, Dkt. No. 92 (Fed. Cl. Mar. 3, 2013). In the end, the one-way-intervention rule counsels that

---

[9] The point is not that the Government would necessarily win on appeal: the Federal Circuit has never explicitly addressed one-way intervention, Dkt. No. 14 at 1, and other Circuit Courts are split on whether and to what extent the "rule" actually bars pre-certification summary judgment. *See* William B. Rubenstein, *3 Newberg on Class Actions* § 7:10 (5th ed.). The point is that in this case, where thousands of homeowners desperately need an enforceable judgment as soon as possible, the Government should not be gifted an extra arrow in an appellate quiver that already threatens to unduly delay homeowners' entitlement to relief.

certification should be taken up first in this case, at an early practicable time, consistent with RCFC 23(c)(1)(A).

## V. Conclusion

At the start of the last hearing, the Court suggested that its role in selecting lead counsel was "a bit like that of a general counsel in a company." Dkt. No. 7 at 16:1-7. That is exactly right. The five key criteria general counsel must assess when selecting outside counsel are (1) whether counsel is free of conflicts and can zealously represent the client, (2) whether counsel has the requisite subject matter experience, (3) whether counsel has demonstrated a fluency with the key legal issues in the cases – both procedural and substantive, (4) whether counsel can be efficient and faithful in representing the client's interests, and (5) whether counsel's proposed fee agreement is fair. The JEC Group believes we satisfy these criteria.

Dated: November 15, 2017   /s/ Jay Edelson

Jay Edelson
jedelson@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Of Counsel:

The Hon. Dwight E. Jefferson
djefferson@coatsrose.com
COATS ROSE
9 Greenway Plaza, Suite 1100
Houston, Texas 77046

Tel: 713.651.0111
Fax: 713.651.0220

William S. Consovoy
will@consovoymccarthy.com
CONSOVOY MCCARTHY PARK PLLC
3033 Wilson Boulevard, Suite 700
Arlington, Virginia 22201
Tel: 703.243.9423

Michael L. Slack
mslack@slackdavis.com
Slack & Davis, L.L.P.
2705 Bee Cave Road, Suite 220
Austin, Texas 78746
Tel: 521.795.8686